881 F.2d 1070
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Elizabeth SILVIA, Defendant-Appellant.
 No. 88-5153.
 United States Court of Appeals, Fourth Circuit.
 Argued May 12, 1989.
Decided July 31, 1989.
 
 Margaret Brooke Murdock, Assistant Federal Public Defender (Fred Warren Bennett, Federal Public Defender on brief), Anthony Reed Gallagher (Gordon, Feinblatt, Rothman, Hoffberger & Hollander on brief) for appellant.
 Susan Moss Ringler, Assistant United States Attorney (Breckinridge L. Willcox, United States Attorney, Richard C. Kay, Law Clerk on brief) for appellee.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and FRANK A. KAUFMAN, Senior District Judge for the District of Maryland, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 Elizabeth R. Silvia appeals from a district court order entered on a jury verdict finding her guilty of the second degree murder of her fifteen-month-old daughter. Silvia challenges the district court's instruction to the jury in her first degree murder trial on the lesser included offenses of second degree murder and voluntary manslaughter, the court's refusal to instruct the jury on involuntary manslaughter, and the prosecution's failure to comply fully with pretrial disclosure requirements. Having concluded that the district court properly instructed the jury and the prosecution fully complied with applicable disclosure requirements, we affirm.
 
 
 2
 * In 1987, Appellant Silvia lived at Fort Ritchie, Maryland, with her husband, who was employed by the United States Army, and her two children, Kimberly and Jamie. On June 11, 1987, Silvia took fifteen-month-old Kimberly to the local hospital, asserting that Kimberly had passed out. Silvia told several people in slightly varying accounts that Kimberly had collapsed after being bathed. The hospital doctor examined Kimberly and concluded that she suffered from a "possible seizure disorder."
 
 
 3
 Three days later, on June 14, 1987, Kimberly again was rushed to the hospital for "passing out." Despite the resuscitation efforts of a neighbor at the Silvia home, an emergency medical technician en route to the hospital and hospital personnel, Kimberly was pronounced dead within an hour of her arrival at the hospital. Silvia's early accounts of this second incident also varied, but the gist of her report was that Kimberly collapsed shortly after stopping her play and walking up to her mother and saying "Mommy."
 
 
 4
 Because no cause of death was apparent, hospital personnel requested and received permission from the Silvias to perform an autopsy to check for the presence of a contagious infection. After performing a limited autopsy, the hospital pathologist concluded that the cause of death was Sudden Infant Death Syndrome (SIDS). At trial, the pathologist explained that SIDS was a diagnosis of exclusion, arrived at when all other possible causes of death are ruled out. She also testified that, in retrospect, she believed SIDS was an inaccurate diagnosis because Kimberly was older than the typical victim and her reported wakefulness at the time of the incident was inconsistent with the normal pattern. Finally, the pathologist admitted that she had considered suffocation a possible cause of death but declined to include such in the autopsy report because it was inflammatory and might precipitate a lawsuit.
 
 
 5
 Sometime after Kimberly's death, the United States Army's Criminal Investigation Division and the FBI conducted a preliminary investigation. As part of the investigation, they questioned Silvia about the details of Kimberly's death, telling her that she was suspected of murder and advising her orally and in writing of her Miranda rights. Silvia signed a written waiver of her rights and responded in detail to questions about the events of June 11 and June 14. At the conclusion of the questioning, Silvia signed a written statement which read in part:
 
 
 6
 On June 11, 1987, I was giving Kimberly Silvia, my daughter, a bath. At that time I was under a lot of stress. I was upset with myself, my marriage and my life in general. I got a weird feeling, got lightheaded and dizzy and felt real angry. I then took Kimberly and held her head under the water in the tub in an attempt to drown her. Her head was under the water for a minute or so. When I took her out of the tub I thought she was dead, but when I looked at her I could see she wasn't dead. When I realized she wasn't dead I tried to save her by CPR. I was successful in saving her, but she didn't look well. Her eyes were grayish-pink, so I called for an ambulance. When Kimberly was taken to the Waynesboro Hospital I told the doctor she passed out in the living room. I did not tell them about the drowning.
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 On June 14, 1987, I was playing with Kimberly and Jamie, my son, around 5:00 p.m. I went over and sat down on the couch and smoked a cigarette. I became real lightheaded, dizzy and felt the same as June 11, 1987. I then went to the kitchen and got a sandwich bag. I took the sandwich bag, baggie, and held the baggie to Kim's face for about two minutes. When I removed the baggie I could tell Kim was dead. I became scared and tried to revive her, but it was too late, she was already gone. I worked on her for about forty minutes but could get no response. I then called a neighbor and got an ambulance. When Kim arrived at the Waynesboro Hospital I told the doctor she had passed out in the living room the same as June 11, 1987.
 
 
 10
 Before signing the statement, Silvia added to it that immediately before each incident she had been upset with her marriage and felt weird, light-headed, dizzy and very angry.
 
 
 11
 Silvia then was indicted on a single count of first degree murder in violation of 18 U.S.C. Sec. 1111. At about this time, the government also exhumed Kimberly's body and conducted a second autopsy. As part of the autopsy, the forensic pathologist, Dr. Ronald Reeves, who specialized in child abuse cases, prepared microscopic slides of tissue samples from each of the major organs and performed a gross examination of all the body organs. Although Dr. Reeves' autopsy examination was essentially negative, revealing no disease process nor injury significant enough to cause death, it showed aspiration pneumonia which was consistent with a near drowning on the 11th of June. Based on the negative findings and the presence of pneumonia, Dr. Reeves concluded that his findings were consistent with Silvia's account of suffocation by baggie. The pathologist also opined that, as evidenced by Kimberly's and Jamie's near-drowning incidents, Silvia engaged in a pattern of child abuse by asphyxiation.[1] Defense counsel received a copy of Dr. Reeves' conclusions in late November 1987, and a copy of the final autopsy report on about February 26, 1988. Trial began on March 7, 1988.
 
 
 12
 At trial, a hospital pathologist from Johns Hopkins University testified for the defense that one of the slides of Kimberly's heart tissue showed certain cellular changes indicating the presence of the virus myocarditis. He further testified that, in his opinion, Kimberly died from congestive heart failure induced by the virus. The pathologist conceded, however, that it is not uncommon to find the presence of myocarditis in patients who have died from other causes.
 
 
 13
 Because the court granted Silvia's request to bifurcate her trial, trying the case on the merits before a jury and preserving her insanity defense for bench consideration later, Silvia's defense on the merits was that Kimberly died from congestive heart failure, precipitated by the myocarditis, rather than from asphyxiation. At the close of evidence, the district court instructed the jury over Silvia's objections to consider whether Silvia was guilty of first degree murder, second degree murder, voluntary manslaughter or not guilty. The court also informed the jury that involuntary manslaughter was a lesser included offense of murder but instructed that there was no evidence to support a finding of involuntary manslaughter and did not instruct the jury as to its definition. The jury returned a verdict of not guilty of first degree murder but guilty of second degree murder. After hearing evidence on the insanity defense, the district court ruled that although Silvia suffered from a severe mental disease, she was not legally insane at the time of the crime. The court then sentenced her to eighteen years in prison, recommended that she undergo psychotherapy, and assessed her a special fine of $50.00
 
 
 14
 This appeal followed.
 
 II
 
 15
 Silvia first challenges the district court's instruction to the jury on the lesser included offenses of second degree murder and voluntary manslaughter. She contends that the instruction was improper because (1) it was not requested by the defense and (2) she lacked sufficient notice of the offenses to prepare an adequate defense. We reject both contentions.
 
 
 16
 Rule 31(c) of the Federal Rules of Criminal Procedure provides in relevant part that a "defendant may be found guilty of an offense necessarily included in the offense charged." Contrary to Silvia's assertion, it is well settled that this rule may be employed by both defense and prosecution. Keeble v. United States, 412 U.S. 205, 208 (1973); Fransaw v. Lynaugh, 810 F.2d 518, 529 (5th Cir.1987); United States v. Raborn, 575 F.2d 688, 691 (9th Cir.1978); United States v. Whitaker, 447 F.2d 314, 317, 320 (D.C.Cir.1971). In fact, the general rule allowing conviction on necessarily included lesser offenses was developed initially as an aid to the prosecution and was only later extended to the defense. Beck v. Alabama, 447 U.S. 625, 633 (1980). Silvia misconstrues the Beck Court's recognition that the benefit of allowing such instruction inures to the defendant's benefit as a prohibition of its allowance when the defense objects. We can find no authority--nor any principled rationale--in support of such a result.
 
 
 17
 We also reject Silvia's argument that she lacked adequate notice of the lesser included offenses to satisfy due process. The record plainly reveals that Silvia had actual notice of the lesser included offenses; she cannot now claim that she was deprived of an opportunity to prepare an adequate defense. The pretrial Joint Jury Instruction, submitted to the court pursuant to its request, included instructions on the lesser included offenses of second degree murder and voluntary manslaughter. In fact, Joint Instruction number six, which was taken from a text of standard instructions, specifically stated that "[t]he crime of murder in the first degree, which is charged in the indictment in this case, necessarily includes the lesser offenses of (1) murder in the second degree, and (2) voluntary manslaughter, and (3) involuntary manslaughter." Supplemental Appendix (SA) at 9. Joint Instruction numbers five and eight also specifically instructed the jury on the elements of second degree murder and manslaughter. SA at 8, 11. After the Joint Instructions were filed, Silvia submitted separate instructions, which also included the manslaughter instructions. SA at 24. During trial, however, Silvia withdrew the requested instructions on the lesser offenses. This withdrawal does not alter the fact that throughout the trial Silvia knew the jury could be instructed on the lesser offenses if the evidence supported them. Such actual notice clearly gave Silvia an adequate opportunity to mount her defense as to each of these charges.
 
 
 18
 Even without this evidence showing that Silvia actually knew of--and at one time even requested--the instruction on the lesser offenses, Silvia was adequately put on notice of the offenses, and the possibility of being called on to defend against them, by the indictment in this case. An indictment is sufficient if it "apprises the accused of the charge against him so he can prepare his defense [and] enables the accused to plead the Double Jeopardy bar to reprosecution if he is later charged with the same offense." United States v. American Waste Fibers Co., 809 F.2d 1044, 1046 (4th Cir.1987). See also Hamling v. United States, 418 U.S. 87, 117 (1974). The fact that the indictment in this case only charged first degree murder does not mean that conviction, and necessarily the instruction on what offenses a jury can consider, must be limited to this offense. As noted above, Criminal Rule 31(c) permits conviction on an offense "necessarily included in the offense charged." See United States v. Whitlock, 663 F.2d 1094, 1100 (D.C.Cir.1980). "At the core of the [lesser included offense] doctrine is the precept that the indictment charging the higher offense adequately notifies the accused that he may be called upon to defend against the included offense as well." Id. at 1101. See also Raborn, 575 F.2d at 691 (rejecting defendant's argument that his defense might have differed if he knew instruction on lesser charge would be given). Because second degree murder and voluntary manslaughter are both lesser included offenses of first degree murder, the indictment here passes muster.
 
 
 19
 To prove first degree murder under 18 U.S.C. Sec. 1111, the statute under which Silvia was charged, the prosecution had to establish (1) the unlawful killing of a human being, (2) malice aforethought, and (3) premeditation (or one of the other elevating factors in the statute).[2] To prove second degree murder under the statute, the prosecution only had to establish the first two elements--unlawful killing and malice aforethought. Because second degree murder consists of elements identical to some of the elements of first degree murder, and because first degree murder cannot be committed without also committing second degree, the lesser offense is an offense "necessarily included in the offense charged," and the indictment adequately placed Silvia on notice of both offenses. See Berra v. United States, 351 U.S. 131, 134 (1956); United States v. Iron Shell, 633 F.2d 77, 88 (8th Cir.1980); Kelly v. United States, 370 F.2d 227, 228 (D.C.Cir.1966).
 
 
 20
 Voluntary manslaughter is also a lesser included offense. Stevenson v. United States, 162 U.S. 313, 320 (1896); United States v. Wagner, 834 F.2d 1474, 1487 (9th Cir.1987); United States v. Scafe, 822 F.2d 928, 932 (10th Cir.1987); DeMarrias v. United States, 487 F.2d 19, 21 (8th Cir.1973). Only the absence of malice distinguishes manslaughter from murder. United States v. Fleming, 739 F.2d 945, 947 (4th Cir.1984). Compare 18 U.S.C. Sec. 1111(a) (definition of murder) and 1112(a) (definition of manslaughter). Silvia therefore was adequately put on notice of this offense and the instruction was properly given.
 
 III
 
 21
 Silvia next challenges the district court's refusal to instruct the jury on involuntary manslaughter. According to her argument, if the instructions on the other lesser included offenses were proper, then the court was obligated to "instruct the jury on the general principles of law relevant to the legal issues raised by all of the evidence"--including involuntary manslaughter. Appellant's Brief at 31-32.
 
 
 22
 It is the district court's obligation to determine--as it did here--whether the evidence as presented would permit a jury rationally to find the defendant guilty of the lesser offense and acquit him of the greater. Keeble v. United States, 412 U.S. 205, 208 (1973); Simpson v. Garrison, 551 F.Supp. 618, 621 (W.D.N.C.1982), aff'd without opinion, 705 F.2d 445 (4th Cir.1983). If the evidence would permit such a result, the defendant is entitled to the instruction. Keeble, 412 U.S. at 208; Simpson, 551 F.Supp. at 621. See also United States v. Echeverri-Jaramillo, 777 F.2d 933, 935 (4th Cir.1985) (noting that defendant only entitled to instruction on lesser offense when greater offense requires jury to resolve a disputed factual element that is not required for conviction of lesser offense); United States v. Seni, 662 F.2d 277, 285 (4th Cir.1981) (same).
 
 
 23
 Silvia argues that there was ample evidence to rebut the prosecution's contention that she acted with malice, the distinguishing element between murder and manslaughter. We agree, but only to the extent that there was evidence of factors that could have negated malice, such as uncontrollable anger or heat of passion. Such negation, however, only reduces the offense to voluntary manslaughter, not involuntary, which is defined as the unlawful killing of a human being without malice "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. Sec. 1112(a). In an attempt to get in under this definition, Silvia points to the evidence showing that (1) Kimberly suffered from myocarditis, making her susceptible to heart failure under stress; (2) Silvia routinely neglected to seek proper medical care for Kimberly; (3) Silvia engaged in a pattern of child abuse through various acts of suffocation and/or attempted drowning; (4) the Silvia home was reportedly neglected and unkempt; and (5) early in the investigation, one doctor was concerned that Kimberly might have died as a result of abuse or neglect, not SIDS. Appellant's Brief at 34-36. The cumulation of this evidence, according to Silvia, is sufficient under the principles of United States v. Fesler, 781 F.2d 384 (5th Cir.1986) to warrant an instruction on involuntary manslaughter. We disagree. The Fesler court held that "[a] proper instruction on an involuntary manslaughter charge requires the jury to find that the defendant (1) act[ed] with gross negligence, meaning a wanton or reckless disregard for human life, and (2) [had] knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another." 781 F.2d at 393. While this instruction was entirely proper on the facts of Fesler--evidence showed that the parents' gross negligence might have caused their daughter's death by scalding--nothing in the present case suggests that any gross negligence or wanton disregard for human life caused Kimberly's death. This distinction is made apparent by Silvia's own argument:
 
 
 24
 It is logical that the circumstances of June 14, 1987 were a culmination of abusive and negligent behavior and not a malicious homicide.... The myocarditis and weakened health because of that condition may very well have been found by the jury to have resulted in the child's death when her mother, repeating a pattern of violent discipline and with wanton and willful disregard for her child's life, pressed the baggie to her face.
 
 
 25
 Appellant's Brief at 35-36. Regardless of Kimberly's possible weakened condition or the alleged prior pattern of abuse, the evidence does not show that, at the time of Kimberly's death, Silvia was acting negligently, wantonly or recklessly within the meanings of those terms as applied to a charge of involuntary manslaughter. Rather, the evidence shows (and Silvia's own confession relates) that Silvia deliberately placed the baggie to Kimberly's face and that it was this action--not Kimberly's weakened condition independent of her mother's action--that caused Kimberly's death.[3] Because of this deficiency in the evidence, the district court properly refused to instruct the jury on involuntary manslaughter.
 
 
 26
 Finally, the jury itself necessarily rejected Silvia's contention that she acted without malice aforethought when they convicted her of second degree murder, which carries malice as an element, rather than voluntary manslaughter, which does not.
 
 IV
 
 27
 Silvia's final argument is that the prosecution failed to disclose certain favorable evidence before trial. In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). More recently, the Court discussed the appropriate standard of "materiality" in cases involving Brady challenges, concluding that the evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682.
 
 
 28
 From a careful review of the course of the proceedings in this case, we are convinced that a Brady violation did not occur. Apparently, Dr. Reeves, who pursuant to court order performed the autopsy on Kimberly's body after its exhumation, found some cell changes in Kimberly's heart tissue that were consistent with myocarditis but, because he felt they were insignificant and could not have caused Kimberly's death, excluded these changes from his final autopsy report, which was turned over to the defense during discovery. The defense did not discover that Dr. Reeves found these cell changes until he was questioned on rebuttal during trial. This, Silvia claims, constitutes a denial of due process under the principles of Brady and Bagley. Fatal to Silvia's claim is her failure to show that the prosecution suppressed the doctor's finding, an essential element of a successful Brady challenge. Perhaps to overcome this deficiency, Silvia attributes, without support, Dr. Reeves' actions as the prosecution's witness to the prosecution itself. Even assuming such attribution is warranted, see, e.g., Boone v. Paderick, 541 F.2d 447, 451 (4th Cir.1976) (imputing to prosecution knowledge of material evidence in hands of police); Barbee v. Warden, 331 F.2d 842, 846 (4th Cir.1964) (same), Silvia still fails to show that any suppression occurred. Although Dr. Reeves testified to finding the cell changes, his failure to include them on his autopsy report was not the result of suppression, but rather the consequence of a medically reasonable determination that the changes were insignificant. To find otherwise would remove all medical discretion from the autopsy process, a result perhaps generally favorable to defendants, but not one we are prepared to reach.
 
 
 29
 Finally, even assuming that Dr. Reeves was obligated to note the cell changes in his autopsy report and that the prosecution was somehow responsible for his failure to do so, there is not a "reasonable probability that, had the evidence been disclosed to the defense [earlier], the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Although perhaps waylaid a bit at the start of trial, in part due to the defense's own failure to request the tissue slides prepared by Dr. Reeves (from which he drew his conclusions) until the eve of trial, Silvia was given a full opportunity to prepare her defense and present the evidence regarding the cell changes through the direct testimony of her own expert witness and the cross-examination of Dr. Reeves. Because the jury heard all of this evidence, we are confident that the outcome was not affected by Dr. Reeves' failure to note the cell changes in his report.
 
 
 30
 For all of the foregoing reasons, we affirm.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 The record contains testimony by an investigator that the appellant stated that in November 1986, she found Jamie face down in three or four inches of water in the bathtub, that she took him out of the tub and gave him CPR, and that, several days later, because he still looked ill, she took him to the hospital
 
 
 [2]
 18 U.S.C. Sec. 1111 as amended in October 1984 provides:
 (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
 Any other murder is murder in the second degree.
 
 
 [3]
 In short, involuntary manslaughter is an unintentional effect that occurs in connection with the commission of some other act which is unlawful in its own right or lawful but committed in an unlawful manner. See 18 U.S.C. Sec. 1112(a); Fleming, 739 F.2d at 948 & nn. 4 & 5. There is simply no evidence in this case that suggests Silvia did not intend to place the plastic baggie over Kimberly's mouth and to cause the ultimate result