PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4266

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAMES ERNEST LESPIER,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Bryson City.  Martin K. Reidinger, District Judge.  (2:10-cr-00009-MR-DLH-1)

Argued: May 17, 2013                    Decided: August 6, 2013

Before TRAXLER, Chief Judge, KING, Circuit Judge, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion.  Judge King wrote the opinion, in which Chief Judge Traxler and Senior Judge Hamilton joined.

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

KING, Circuit Judge:

Following a six-day jury trial in the Western District of North Carolina, James Ernest Lespier was convicted of two offenses arising from the killing of his ex-girlfriend on the reservation of the Eastern Band of Cherokee Indians. Count One of the two-count indictment alleged that Lespier committed first-degree murder, in violation of 18 U.S.C. §§ 1111 and 1153.[1] Count Two alleged that he used a firearm during and in relation to a crime of violence, namely murder, in contravention of 18

---

[1] Section 1153 of Title 18 provides that "[a]ny Indian who commits . . . murder . . . within the Indian country[] shall be subject to the same law and penalties as all other persons committing [murder], within the exclusive jurisdiction of the United States." Murder is defined in § 1111(a) as "the unlawful killing of a human being with malice aforethought." That provision then distinguishes between first- and second-degree murder, providing that

> [e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

> Any other murder is murder in the second degree.

Under § 1111(b), first-degree murder is punishable "by death or by imprisonment for life," and second-degree murder by "imprison[ment] for any term of years or for life."

U.S.C. § 924(c)(1)(A)(iii) and (j)(1). For those convictions, Lespier received two consecutive life sentences.

On appeal, Lespier challenges the district court's denial of judgments of acquittal, two of the court's evidentiary rulings, and its decision not to instruct the jury on the lesser-included offense (on Count One) of second-degree murder. As explained below, the court properly denied the acquittals and did not err in its evidentiary rulings. Although the court should have instructed on the second-degree murder offense, such error was invited by Lespier and cannot be used to disturb his convictions or sentences. Consequently, we affirm.

I.

A.

Lespier's victim was his ex-girlfriend Mandi Smith, with whom he had a three-year-old son.[2] On May 17, 2010, Lespier, an enrolled member of the Eastern Band of Cherokee Indians, spent the day fishing with his friend Bill Caley and Smith. That evening, Lespier hosted a fish fry at his residence, located in Indian country within the boundaries of the Eastern Cherokee reservation. The festivities were disrupted, however, when

_____

[2] We recite the facts in the light most favorable to the prosecution, the prevailing party at trial. See United States v. Singh, 518 F.3d 236, 241 n.2 (4th Cir. 2008).

3

Lespier and Smith began arguing, which prompted Lespier to give Caley a ride home from the party. After returning to his residence, Lespier shot Smith in the back of the head with a .38 caliber revolver, killing her instantly.

At about 1:16 a.m. on May 18, 2010, Lespier called 911, screaming incomprehensibly but ultimately conveying the message that Smith had been shot and was dead. Around 1:30 a.m., police officers responded to the 911 call and encountered Lespier as he walked out of his home. Lespier "was covered in blood," J.A. 328,[3] and officers understood little of what he was saying. Indeed, the blood on Lespier's back was so thick that it "seemed like it was motor oil," id. at 330, and the officer who handcuffed Lespier "got blood all over his uniform and hands," id. at 351.

After handcuffing Lespier, the officers went inside his residence, where they found Smith lying face-up on the floor. Smith was clad only in her underwear and socks, and one of the socks was rolled down off of her heel. She had blood on and about her head, the front of her body, and her back, and the officers could hear a child screaming upstairs. Once they had secured the crime scene, one of the officers retrieved Lespier's

---

[3] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

and Smith's son from an upstairs bedroom, covered the little boy's head, and carried him out of the home.

Upon examining Smith's body, the paramedics found a single gunshot wound on the back of her head. There was a large amount of blood under the back of Smith's head, and her wound was "obvious[ly]" an injury that was "not survivable." J.A. 369. Smith's skin was also "mottled," indicating that "the blood had had time to pull away from her skin and pool in other parts of her body or bleed out completely." Id. at 370. In addition, there was "a lot of blood around [her] torso" and on the floor. Id. Based on "[s]wirl marks in the blood that were somewhat dry," it appeared as though the crime scene "had been cleaned up." Id. at 370, 383. A .38 caliber revolver was found under Smith's left leg, and a single oxycodone pill, in a plastic baggie, lay near her right armpit.

Several shots appeared to have been fired into the walls of the home and, on the sofa immediately beside Smith's body, officers discovered an unloaded shotgun with a fresh crack in the wooden stock. While securing the shotgun, a five-inch piece of wood broke off the stock. Blood had also been deposited on the door frame and doorknob leading into the house, on the deck, and on a set of keys in front of the entertainment center in the living room.

5

In a closet near the stairwell, officers located a gun safe containing prescription pills and ammunition. According to Smith's stepfather, Frazier Price, Lespier had shown him two firearms in the safe a couple of days before the shooting. At that time, Lespier advised Price that "[h]e always kept [the firearms] locked in the safe" when Smith was around because she had stolen money and pills from him. J.A. 1105. Finally, in the driveway connected to the home, and "jammed up underneath . . . the front end of a car," officers noticed a travel bag with a torn strap. Id. at 524. The bag contained clothing and makeup belonging to Smith.

During the investigation, an FBI firearms toolmark examiner tested the .38 revolver and ammunition using ballistics gel. The FBI expert determined that the muzzle of the revolver was between five and fifteen centimeters from Smith's skin at the time of the fatal gunshot. Another FBI expert found gunshot residue on both Smith and Lespier, indicating that they had each handled or been in close proximity to a weapon being fired.

Dr. John Davis, who conducted an autopsy of Smith's body, concurred that the wound inflicted by the .38 revolver was not a "contact gunshot wound," but was inflicted from an "intermediate" distance, that is, "somewhere between contact and distant." J.A. 714. Relevant to the blood found on Lespier, Davis said that Smith's heart had stopped beating immediately

6

after she was shot, causing her blood to drain only by gravity, rather than through spurting or pumping. Davis explained that an individual who attempted CPR, as Lespier would later claim to have done, would not have blood on his front side, because there was no source of bleeding on the front of Smith's body. In addition, Davis stated that the mottled appearance of Smith's skin would take "at least a couple of hours to set in." Id. at 770. Finally, Dr. Davis calculated the trajectory of the gunshot that had killed Smith. The shot, which entered the back of her neck three centimeters below the base of the skull and two centimeters left of the midline, inclined from her left to right by ten degrees and upward by thirty degrees.

In addition to the fatal gunshot wound, Smith had fresh abrasions on the inside of her right forearm, and a "significant localized hematoma" on the top of her head. J.A. 716. Dr. Davis opined to the jury that the strap of the travel bag found in the driveway could have caused the abrasions on the inside of Smith's arm, and that the hematoma found on Smith's head was fresh and had been inflicted by something flat.

B.

In the hours, days, and months following Smith's murder, Lespier gave the authorities and others several exculpatory versions of the relevant events. Because his shifting accounts of what occurred played a central role in Lespier's prosecution

7

and trial, we briefly summarize such statements, highlighting their inconsistencies.

While still at the scene of Smith's murder in the early morning hours of May 18, 2010, Officer Cherie Dennis asked Lespier to explain what happened, recording his statement (hereinafter the "first statement"). In his first statement, Lespier said that, earlier that night, he had tried to take a pill from Smith. When he did so, Smith seized his .38 revolver and started shooting, leading to her accidental death:

> She got mad because I tried to take a pill from her. She took my gun and started shooting all over the house. I tried to tell her "Please stop, please stop." My little boy started screaming and crying. I keep my gun right inside the little door. It's a closet where I keep all my guns. She grabbed my pistol. She had shot like four or five shots left. It went off when we started wrestling back and forth over the gun. We fell on the floor and it went off and she started bleeding, blood, pouring blood, from the back of the head. I tried to tell her to stop. I was laying on the couch when she started shooting. She was . . . shooting above my head. When I grabbed her, I thought her arm with the gun was away from her. When I asked her to stop, she yelled at me, "Give me my pill back." My son was upstairs.

J.A. 354-55. Officer Dennis then transported Lespier to the police station, where she noticed that that the "entire seat" of her patrol car was covered in blood. Id. at 351-52.

At approximately 4:00 a.m. on May 18 — less than three hours after the 911 call — FBI Agent Randy Cosby arrived at the police station and met with Lespier, who was yet "covered in

8

blood from head to toe." J.A. 445. Cosby collected Lespier's clothing, permitted him to wash, and began to interview him around 9:00 a.m. (the "second statement"). In his second statement, Lespier added several new details and revised others. Lespier recounted that Smith sat down in the recliner in the living room, and that she pointed the .38 revolver at him shortly thereafter. Smith then fired off to Lespier's left side, demanding between shots that Lespier return her pill. Consistent with his first statement, Lespier recounted that he was able to "grab hold of [Smith] and struggle with her," and that they fell to the ground, with Smith underneath him. Id. at 454. On top of Smith, still struggling for the .38 revolver, Smith's arms went above her head and, as she attempted to kick Lespier, "the gun discharged," and Smith grew still. Id. at 454-55. Lespier then added that he attempted to give Smith mouth-to-mouth resuscitation, and called 911 when his efforts were unsuccessful. Lespier told Cosby that he did not know that the shotgun stock had been cracked, that he kept the shotgun lying on the top of his living room couch, and that he left it unloaded when his son was in the home. Lespier gave no indication that the shotgun had been used in the struggle.

After a short break at the police station, Detective Mary Lambert proceeded to interview Lespier. Lespier began speaking with Lambert around 11:00 a.m., again adding new details and

9

changing others (the "third statement"). Though his second statement had Lespier and Smith struggling briefly on the floor, in his third statement Lespier recounted that "as they hit the floor, the gun went off." J.A. 828-29. Lespier also related that, when he and Smith fell, his forearm struck the side of her face, and that he thought he had broken her neck. Lespier explained that he then put his finger into the hole in Smith's neck, adding that the revolver was in Smith's right hand and that he did not touch it.

At Detective Lambert's suggestion, Lespier agreed to reenact his struggle with Smith, using Lambert's body to illustrate how Smith may have shot herself. In unsuccessfully attempting to do so, Lespier manipulated Lambert's wrist into a painful position, prompting Lambert to stop the reenactment. At that point, Lespier "got real emotional" and asserted again that he and Smith "went to the floor and the gun went off." J.A. 832. In making his third statement, Lespier first asserted that he had grabbed the shotgun, and that it may have rolled down the back of the living room couch.

Detective Lambert then continued her interview, asking Lespier to go over his story again, and explaining that she "wanted to make sure that [she] was clear on what he was actually saying." J.A. 838. Lespier complied (making his "fourth statement"), recounting that Smith had "embarrassed" him

10

at the fish fry by "running her mouth" and "[bringing] the pill up again." Id. at 843, 927. Lespier added that he, Smith, and their son took Bill Caley home after the neighbors had left the fish fry and that, upon returning to the residence, Lespier put their son to bed. Back downstairs, he and Smith discussed getting back together, and, at one point, Lespier told Smith that she was "just mad because [her] future hubby outdid [her] again fishing." Id. at 845. Lespier elaborated that Smith got up and "went crazy," brandishing the .38 revolver and telling Lespier to give her her "f-ing pill." Id. at 928. At that point, Lespier decided "to shoot her in the leg" because "[he] was scared. [He] thought she was going to shoot [him]." Id. at 846. Rather than shoot Smith, however, Lespier claimed that he "slung the shotgun at her, at her leg." Id. Smith then fired at him and, while he was trying to get the revolver from her, "they went to the floor." Id. Lespier added that Smith tried to bite him, and he asked Lambert to look for bite marks on his forearm, which she did not find. In his fourth statement, Lespier revealed that he "must have" picked up the revolver, and indicated that he did not think Smith was dead. Id. Though Lambert did not ask whether the shotgun had discharged, Lespier said that "[t]he shotgun didn't go off in the house." Id. at 841.

11

Agent Cosby then conducted another interview, which began around 1:00 p.m. on May 18 and lasted approximately an hour (the "fifth statement"). Lespier's account of his struggle with Smith changed yet again. In his fifth statement, Lespier recounted that he was straddling Smith during the struggle, standing over her while she was on her back. While atop Smith, "[Lespier] grabbed the gun and pulled it toward his chest" in an "upward motion." J.A. 459. During "that motion the gun discharged, and she laid there still, unresponsive." Id.

For whatever reason, Lespier was released from police custody later in the day on May 18. That evening, he talked to his friend Bill Caley and, in an entirely new version of the shooting (the "sixth statement"), told Caley that Smith "was standing there with a pistol pointing at him" as he came through the door of Lespier's house after having given Caley a ride home. J.A. 402. According to his sixth statement, Lespier repeatedly asked Smith what she was doing, then "grabbed the gun," after which "they went to wrestling over the gun . . . and they fell and the gun went off." Id.

Dr. Davis completed his autopsy of Smith's body the following day (May 19, 2010), and the inconsistencies identified between Davis's findings and Lespier's various exculpatory statements prompted the authorities to charge Lespier with murder. Lespier turned himself in that day. On June 1, 2010, a

12

federal grand jury returned a two-count indictment charging Lespier in Count One with second-degree murder and in Count Two with the use of a firearm in relation to a crime of violence. Six months later, on December 7, 2010, the grand jury returned a superseding indictment, the operative indictment in this case. Count One alleged that Lespier had committed first-degree murder, and Count Two realleged that he had used a firearm in relation to a crime of violence.[4]

While in custody awaiting trial, Lespier described the shooting of Smith to his fellow inmate Mitchum Turpin. Lespier insinuated to Turpin that he waited some time after the shooting before calling 911, and admitted that he "left the blood on his face so when they showed up they would be able to see it." J.A. 961.

---

[4] Consistent with the requirements of 18 U.S.C. §§ 1111 and 1153, see supra note 1, the indictment alleged in Count One that

> [o]n or about the 18th day of May, 2010, in Jackson County, in Indian country, that is within the boundaries of the Eastern Band of Cherokee Indians reservation, and within the Western District of North Carolina, [Lespier,] an Indian, did unlawfully kill another human being with malice aforethought, and did so willfully, deliberately, maliciously, and with premeditation.

J.A. 14.

C.

Several months prior to the trial, the prosecutors notified Lespier's lawyers that they intended to present evidence, pursuant to Federal Rule of Evidence 404(b), of Lespier's prior threats and physical violence against Smith. Specifically, the prosecutors sought to introduce ten instances of domestic violence and four threats of violence.

Lespier opposed the use of any Rule 404(b) evidence, and the district court considered and ruled on the motion on May 31, 2011, the first day of trial. After consideration of the proffered evidence and the applicable legal principles, the court excluded certain prior bad acts and reserved judgment on others, conditioned on the prosecutors' ability to establish a proper foundation. Ultimately, the court permitted the evidentiary use of certain threats and physical violence by Lespier against Smith in the years leading up to her murder. Smith's sister, Tasha, told the jury that she saw Lespier shove Smith through a glass window, resulting in gashes and cuts on Smith's back. Tasha also described an incident when Lespier grabbed a heavy wooden mail holder and "turned and threw it at [Smith]," hitting her "in the area of the head." J.A. 1033. In addition, Tasha recounted that Lespier told her that he hated Smith, once going so far as to threaten "to put rat poison in her food." Id. at 1038. Lespier also said to Tasha that he

14

"could just kill [Smith], strangle her." Id. Finally, Tasha described a horrifying experience when Smith and her son came to stay with Tasha after a fight with Lespier. Lespier called Smith repeatedly until, when Smith finally answered (on speakerphone), Lespier threatened to come to Tasha's house, tie Smith to a chair, shoot their son in front of her, and finally "shoot [Smith] and then turn the gun on himself." Id. at 1042.

Smith's grandmother, Dorothy Conner, recounted a violent incident that took place at her home on Mother's Day in 2009. While cooking outside on a grill, Conner saw Smith run out of the house, pursued by Lespier with a knife, while Smith carried their son in her arms. Bill Caley, Lespier's friend, told the jury that on one occasion, Lespier hung up on Smith and stated, "Need to shoot that bitch in the face." J.A. 401. The trial court repeatedly instructed the jury that the Rule 404(b) evidence could be considered only for the limited purposes of Lespier's intent and the absence of an accident, that such evidence was not relevant to Lespier's character, and that the jury could not infer, based on character, that Lespier may have committed the acts charged in the indictment.[5]

_____

[5] During the presentation of the Rule 404(b) evidence, and again during its charge to the jury, the district court gave the following instruction — always without objection — in substantially identical terms:

(Continued)

15

D.

Leading up to trial, on May 12, 2011, Lespier notified the government of his intent to call two expert witnesses. First, Lespier desired to offer evidence from a "human biomechanical expert . . . to present a computer animation depicting the event in question to show the possibility that the event did in fact occur as the Defendant described in statements given to law enforcement." J.A. 20-21. Second, Lespier intended to call "an expert in human psychology to offer testimony concerning the alleged inconsistencies in the statements made by the Defendant and to offer an opinion as to possible reasons for such alleged

---

[T]his evidence has been admitted . . . for the limited purpose of your deciding whether or not the defendant harbored the intent to kill Ms. Smith on the date in question, May the 18th, 2010, or that the incident at issue in this case was not an accident. You may not, however, consider this as evidence of bad character. You may not make any inference based upon the defendant's character that he may have committed the acts charged in this case. Even if you find that the defendant may have committed such acts in the past, you may not consider this evidence of these other acts as a substitute for proof that the defendant committed the crime[s] charged and you may not use this evidence to conclude that the defendant has a bad character or has any propensity to commit crimes of the nature as charged in this case.

J.A. 1122; see also id. at 1030-31, 1036, 1038-39, 1044-45, 1484-85.

16

inconsistencies." Id. at 20. The government opposed only the psychology expert.[6]

The district court addressed the issue of the psychology expert on the first day of trial, by which time defense counsel had produced a report explaining that the expert's testimony would focus on the neurological effects of extended sleep deprivation. After reviewing the report, the court agreed with the government and excluded the psychology expert's testimony, ruling that although Lespier's lawyers could argue for discounting inconsistencies in Lespier's exculpatory statements, the proposed expert testimony would invade the province of the jury. The jury then heard, over the course of six days, the trial evidence summarized above.

## E.

At the conclusion of the prosecution's evidence, and again at the close of all the evidence, Lespier unsuccessfully sought judgments of acquittal. After denying the renewed acquittal

---

[6] The government did not challenge the admissibility of Lespier's biomechanics expert, who essentially sought to contradict Dr. Davis's opinion that Lespier's account was "inconsistent with the physical facts." J.A. 740. While we are obliged to credit Dr. Davis's account — because it was accepted by the jury — we note that Lespier's biomechanics expert was impugned at trial. During cross-examination, Lespier's expert admitted that the animation he created did not "have [Smith] holding the gun at all" but instead "had her hand placed in a position close to the gun," and that he did not "know exactly how [Smith] fired the weapon." Id. at 1289.

17

motion, the district court turned to issues relating to jury instructions. Lespier opposed an instruction, pertinent to Count One, which would permit the jury to convict on the lesser-included offense of second-degree murder. More specifically, his lawyer explained that Lespier was not "asking for second degree" and characterized the proposed instruction as an attempt by "the government to change the rules now that they've indicted him on first degree." J.A. 1347. When the court asked if Lespier wanted the case to "go to the jury on first degree and only first degree," his lawyer again said that "[t]hey charged him, we're standing trial for that, and that's what we want." Id. at 1350. The government argued in favor of a second-degree murder instruction, asserting that it was "not entirely up to the defendant"; that both "first degree and the lesser included of second degree ought to be submitted"; and that the court should submit to the jury "every lesser included that the evidence supports." Id. at 1359.

Shortly thereafter, Lespier's lawyer reiterated his client's opposition to a second-degree murder instruction, urging the district court to confirm Lespier's desire in that regard. The court then questioned Lespier himself, explaining that his lawyer had informed the court that Lespier "[did] not seek for a lesser included offense to be submitted to the jury," which would mean that "the jury would decide simply that

18

[Lespier was] either guilty of first-degree murder or not guilty," and "would not be given the opportunity to convict as to some lesser offense, such as second-degree murder or possibly voluntary manslaughter." J.A. 1373-74. Lespier then confirmed that he had discussed the issue with his counsel, and that it was his personal decision to submit Count One to the jury on the first-degree murder charge only, opposing any instructions on the lesser-included offense. Before concluding on the point, the court again asked Lespier to confirm that it was his own decision to proceed in that manner. Lespier responded, "Yes, sir, Your Honor, it is." Id. at 1374.

After a brief recess, the government renewed its request for a second-degree murder instruction, contending that this Court's unpublished decision in United States v. Silvia supported its position. See No. 88-5153 (4th Cir. July 31, 1989) (unpublished). The court rejected Silvia, instead interpreting our decision in United States v. Baker, 985 F.2d 1248 (4th Cir. 1993), to support the proposition that a trial court may decline a lesser-included offense instruction requested by the prosecution when the defendant objects. Accordingly, the court instructed the jury that it could convict Lespier on Count One only if it found the elements of first-degree murder.

19

In closing, the prosecution relied extensively on the various conflicting exculpatory statements made by Lespier, asserting that Lespier "didn't tell you anything — he didn't even tell you the same story, much less something that was believable or truthful."  J.A. 1452.[7]  The government set forth its own version of the relevant events, suggesting inferences that the jury could draw from the evidence.  The prosecution theorized that Smith had attempted to leave Lespier's residence, making it to the driveway before having her bag ripped from her arm by Lespier.  Lespier then clubbed Smith over the head with the shotgun, cracking its stock and causing the deep bruising found by the medical examiner.  Lespier had retrieved the .38 revolver from the locked safe, and simply executed Smith by shooting her at close range in the back of the head.  After that, Lespier "dragged her a little bit and made that sock come

_____

[7] Pertinent to the government's theory that Lespier had fabricated his exculpatory statements, the district court instructed the jury that

> [w]hen a defendant voluntarily offers an explanation or voluntarily makes some statement tending to show his innocence, and if you, the jury, find the defendant knew this statement or explanation was false, then you, the jury, may consider this as showing a consciousness of guilt on the part of the defendant, since it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence.

J.A. 1481.

20

up," then got blood all over his back by "flipping [Smith] over the shoulder, [with] blood draining down out of the hole, down his back." Id. at 1460. Finally, Lespier fired multiple shots into the walls of his residence in order to support his fabricated stories.

Accepting the prosecution's evidence as sufficient, the jury found Lespier guilty of both charged offenses, including first-degree murder. On March 29, 2012, Lespier was sentenced to life imprisonment on each count, to be served consecutively. Lespier timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Lespier raises three appellate contentions. First, he challenges the district court's denial of judgments of acquittal. Second, Lespier maintains that the court abused its discretion in (1) permitting the introduction of evidence, pursuant to Rule 404(b) of the Federal Rules of Evidence, of his prior threats and violence against Smith, and (2) precluding his psychology expert's testimony on the effects of sleep deprivation. Finally, in a reversal of his failed trial strategy, Lespier now asserts that the trial court should have instructed the jury that it could convict on the lesser-included offense of second-degree murder.

A.

We begin with the district court's denial of judgments of acquittal, which we review de novo. See United States v. Kellam, 568 F.3d 125, 132 (4th Cir. 2009). When a defendant challenges the sufficiency of the evidence, we will sustain a guilty verdict if there is substantial evidence to support it, drawing all reasonable inferences therefrom in favor of the prosecution. See United States v. Whitfield, 695 F.3d 288, 310 (4th Cir. 2012).

In challenging the district court's denial of acquittals, Lespier characterizes the evidence as legally insufficient in two respects. First, he maintains that there was no evidence suggesting that he, rather than Smith, had pulled the trigger of the .38 revolver. Second, Lespier asserts that there was no evidence to support the inference that his fatal shooting of Smith was a premeditated act.

Each of the foregoing contentions is readily refuted. In the light most favorable to the prosecution, the evidence permitted the jury to find ample incriminating facts supporting the two convictions, including the following:

- In the past, Lespier had physically abused and repeatedly threatened to kill Smith;

- On the evening of the fatal shooting, Smith sought to leave Lespier's home, proceeding as far as the driveway before a bag containing makeup and clothing was ripped from her arm;

22

- Lespier hit Smith on the head with the shotgun with sufficient force to crack its stock;

- Lespier had retrieved the murder weapon, the .38 caliber revolver, from a locked safe;

- Based on the trajectory of the gunshot that killed Smith, a self-inflicted wound was not possible;

- Lespier had tampered with the crime scene, moving Smith's body, wiping up her blood, and planting the revolver and a pill near her body;

- Lespier waited some period of time before calling 911; and

- Lespier made multiple false exculpatory statements seeking to explain the relevant events.

Predicated on the foregoing, together with the balance of the record, it is clear that the government presented substantial evidence proving that Lespier committed murder in the first degree, as alleged in Count One. The district court therefore properly denied judgments of acquittal.

B.

Next, we consider Lespier's evidentiary contentions, i.e., that the district court erroneously admitted evidence pursuant to Rule 404(b) and improperly excluded Lespier's psychology expert. We review those evidentiary rulings under the abuse of discretion standard. See United States v. Rooks, 596 F.3d 204, 209-10 (4th Cir. 2010).

23

1.

Lespier maintains that the district court erred in its Rule 404(b) ruling relating to his prior threats and acts of violence against Smith. The government responds that the evidence was properly admitted, both to show that Lespier intentionally murdered Smith and to disprove any theory that Smith had accidentally shot herself.

Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evidence of prior bad acts, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Evidence offered under Rule 404(b), like all other evidence, must be relevant and is subject to assessment under Rule 403.[8] We have formulated a four-part test for assessing the admissibility of evidence offered under Rule 404(b):

---

[8] Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

> (1) the prior-act evidence must be relevant to an issue other than character, such as intent; (2) it must be necessary to prove an element of the crime charged; (3) it must be reliable; and (4) . . . its probative value must not be substantially outweighed by its prejudicial nature.

United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997) (internal quotation marks omitted).  As we have explained, "Rule 404(b) is an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition."  Rooks, 596 F.3d at 211 (internal quotation marks omitted).

Simply stated, the district court did not abuse its discretion in admitting the Rule 404(b) evidence of Lespier's prior threats and acts of physical violence against Smith.  Such evidence was relevant to Lespier's intent and to show that Smith did not shoot herself by accident or mistake, thus fulfilling the first prong of Queen.  With regard to Queen's second prong, the challenged evidence was necessary to prove the disputed element of Lespier's intent.  The third Queen prong is also plainly satisfied:  The court thoroughly inquired into the reliability of each item of Rule 404(b) evidence that was presented to the jury, and it did not err in that respect.  Finally, on the fourth prong, the probative value of the Rule 404(b) evidence was substantial, and was not outweighed by unfair prejudice or any of the Rule 403 criteria.  Indeed, any

25

risk of unfair prejudice was effectively mitigated by the court's carefully framed limiting instructions regarding proper consideration of such evidence. See United States v. White, 405 F.3d 208, 213 (4th Cir. 2005) ("[A]ny risk of such prejudice was mitigated by a limiting instruction from the district court clarifying the issues for which the jury could properly consider [the Rule 404(b)] evidence.").

## 2.

Lespier also contends that the trial court committed reversible error by excluding the evidence of his psychology expert, who would have pointed to sleep deprivation as an explanation for the various inconsistencies in Lespier's statements. Lespier emphasizes that, because those inconsistencies were used to impeach his statements' credibility, the exclusion of his expert prejudiced his ability to mount a defense. The government counters that expert testimony on the psychological effects of sleep deprivation must be treated with the same caution that courts have applied to evidence on the fallibility of eyewitness testimony, and that the court did not abuse its discretion in excluding the expert. Alternatively, the government asserts that any error was harmless.

Lespier is correct in arguing that the Constitution guarantees every accused "a meaningful opportunity to present a

26

complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal quotation marks omitted). And the Supreme Court has explained that "the right to present a defense . . . is a fundamental element of due process." Washington v. Texas, 388 U.S. 14, 19 (1967). It does not follow, however, that the exclusion of Lespier's psychology expert somehow contravened the Constitution or otherwise amounted to error.

To be admissible, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The helpfulness requirement of Rule 702 thus prohibits the use of expert testimony related to matters which are "obviously . . . within the common knowledge of jurors." Scott v. Sears Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986). The assessment of a witness's credibility, as we have explained, is "usually within the jury's exclusive purview." United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995). Thus, in the absence of unusual circumstances, Rule 702 renders inadmissible expert testimony on issues of witness credibility.

We have recognized a narrow exception to the general rule. See United States v. Harris, 995 F.2d 532, 534-36 (4th Cir. 1993) (affirming exclusion of expert testimony on validity of eyewitness identification, but recognizing possible admissibility of such evidence in narrow circumstances).

27

Nevertheless, we agree with the government that, in the typical case, the effects of sleep deprivation, like problems with eyewitness identifications, are readily comprehended by jurors and do not require an expert for their explanation. Simply put, the trial court did not abuse its discretion in excluding Lespier's expert on the basis that his testimony would "intrude[] on the jury's role regarding the assessment of the credibility of witnesses." J.A. 220.

C.

Finally, we dispose of Lespier's contention that the district court erred in declining the prosecutors' multiple requests for an instruction on the lesser-included offense of second-degree murder. We review an alleged instructional error for abuse of discretion. United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009). When a trial court has rejected a proposed instruction, we will reverse only if that instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." Id. (internal quotation marks omitted).

Nevertheless, an error that was not objected to at trial is generally reviewed only for plain error. See Fed. R. Crim. P. 52(b). Under that standard, "before an appellate court can

28

correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" Johnson v. United States, 520 U.S. 461, 466–67 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 467 (internal quotation marks omitted). In the context of plain error review, an error that was invited by the appellant "cannot be viewed as one that affected the fairness, integrity, or public reputation of judicial proceedings." United States v. Gomez, 705 F.3d 68, 76 (2d Cir. 2013). Indeed, recognizing an invited error would seriously undermine confidence in the integrity of the courts. See id. ("[T]he fairness and public reputation of the proceeding would be called into serious question if a defendant were allowed to gain a new trial on the basis of the very procedure he had invited."); see also United States v. Day, 700 F.3d 713, 727 n.1 (4th Cir. 2012) ("[A] 'defendant in a criminal case cannot complain of error which he himself has invited.'" (quoting Shields v. United States, 273 U.S. 583, 586 (1927))).

The government adheres to its position that the requested instruction on second-degree murder was correct, and that it was

29

not covered by the court's charge to the jury. The government maintains, however, that the instructional error was invited by Lespier and thus is not reversible. In response, Lespier does not dispute that the instructional error was invited, but contends that an exception to the invited error doctrine applies in this case.

As an initial matter, we are satisfied that the district court erred when it relied on United States v. Baker, 985 F.2d 1248 (4th Cir. 1993), for the proposition that a trial court may decline to instruct on a lesser-included offense that is supported by the evidence and requested by the prosecution. In Baker, we simply agreed that "a district court has no discretion to refuse to give a lesser-included instruction if the evidence warrants the instruction and the defendant requests it." Id. at 1259. That decision does not suggest, however, that the defendant is entitled to veto the prosecution's request for a proper instruction on a lesser-included offense.

Indeed, Rule 31 of the Federal Rules of Criminal Procedure provides, in pertinent part, that "[a] defendant may be found guilty of . . . an offense necessarily included in the offense charged." Though the "lesser included offense doctrine developed at common law to assist the prosecution," Rule 31 can be invoked by either the prosecution or the defense. Keeble v. United States, 412 U.S. 205, 208 (1973). And neither party is

30

entitled to jettison a requested instruction on a lesser-included offense, provided that "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." Id.; see also United States v. Silvia, No. 88-5153 (4th Cir. July 31, 1989) (unpublished) (affirming second-degree murder conviction premised on lesser-included offense instruction given over defendant's objection).

Although we have acknowledged a potential exception to the invited error doctrine "when it is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice," we have likewise rejected the notion that such circumstances exist where a defendant, "as a matter of sound trial strategy," requests an instruction on a lesser-included offense that the court then gives to the jury. United States v. Herrera, 23 F.3d 74, 76 (4th Cir. 1994) (internal quotation marks omitted). The converse is also true; that is, a defendant who invites error by successfully opposing an instruction on a lesser-included offense is not entitled to benefit from that error. Lespier opposed the second-degree murder instruction as a matter of sound trial strategy, and there is no indication that this failed strategy threatens the integrity of the justice system or represents a miscarriage of justice. As such, the

31

trial court's instructional error is not a basis for disturbing Lespier's convictions.

## III.

Pursuant to the foregoing, the judgment of the district court is affirmed.

<u>AFFIRMED</u>