PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4831

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAY BONANZA BRILEY,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.   Liam O'Grady, District Judge.  (1:12-cr-00482-LO-1)

Argued: September 19, 2014        Decided: October 22, 2014

Before WILKINSON, DUNCAN, and KEENAN, Circuit Judges.

Affirmed by published opinion.   Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Keenan joined.

**ARGUED:** Cara Viglucci Lopez, SIDLEY AUSTIN LLP, Washington, D.C., for Appellant.  David Sang Hak Lee, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Frances H. Pratt, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; Gordon D. Todd, Sean R. Dickson, SIDLEY AUSTIN LLP, Washington, D.C., for Appellant. Dana J. Boente, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

WILKINSON, Circuit Judge:

Appellant Jay Bonanza Briley was convicted after a two-day jury trial on four counts arising from intimate sexual activities in a national park and an ensuing physical altercation with United States Park Police officers. Briley now challenges the interpretation of the statute under which he was convicted, 18 U.S.C. § 111. He also contests the admission of evidence of a subsequent act under Federal Rule of Evidence 404(b). Finding no reversible error, we affirm.

I.

In reviewing Briley's conviction, we consider the evidence in the light most favorable to the prevailing party, here the government. Evans v. United States, 504 U.S. 255, 257 (1992); see United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (en banc).

A.

On the afternoon of January 12, 2012, Park Police officers were patrolling the Washington Sailing Marina in Alexandria, Virginia. The Marina serves as a recreational area at Daingerfield Island, a national park situated along the George Washington Memorial Parkway and the Potomac River. The Marina, which has several parking lots, is also a reputed meeting place

for sexual encounters. Officers also patrol the area to prevent criminal activities such as illicit drug use, alcohol offenses, and disorderly conduct.

Two plain-clothes Park Police officers on patrol in an unmarked vehicle, William Brancato and Robert Usher, observed a man parking his car next to Briley's SUV. After the man entered Briley's vehicle, the two men reclined the front seats, and Briley placed a sunscreen across the windshield. Seeing other people approaching, Briley drove to another Marina parking lot. Inside the newly parked SUV, Briley was naked, and his companion's pants were down. From afar, the two officers saw Briley and the other man preparing to engage in sexual relations.

Brancato and Usher contacted two other Park Police officers on patrol nearby, Corey Mace and Thomas Twiname. Mace and Twiname, who were wearing tactical attire with police markings, drove to the Marina and approached Briley's SUV on foot. Briley exclaimed, "It's the cops." J.A. 151. In response to a directive from Mace, Briley's companion opened the front passenger door, exited the SUV, and lay on the ground. Briley remained in the vehicle.

Standing on the driver's side of the vehicle, Twiname banged on the window and yelled, "Police, open the door." J.A. 115. When Briley objected that he was naked, Twiname

3

threatened to smash the window. Briley then opened the door, but he refused to follow Twiname's subsequent order to exit the vehicle. Twiname grabbed Briley's left arm and struggled to pull him from the vehicle. After Twiname let Briley pull his pants up, Briley locked his legs under the steering column to secure himself and began honking the horn. In an unsuccessful effort to handcuff Briley, Twiname entered the SUV and ended up behind the driver's seat. From there, he wrapped his arms around Briley's neck and upper shoulders. Mace tried to assist his fellow officer with a wristlock, to no avail. Twiname could not subdue Briley.

The two plain-clothes officers, Usher and Brancato, arrived on the scene, shouting "police" and "stop resisting." J.A. 121, 212. After securing Briley's companion, Usher joined Brancato on the driver's side of the car. As these two officers grabbed Briley and attempted to wrest him from the vehicle, Briley tried to push Usher out of the way and struck him in the arms, side, and lower back. Usher suffered from various lower-back problems after the incident.

During the fracas on the driver's side of the car, Briley kicked Brancato in the abdomen. Brancato then tried to loosen Briley's position in the vehicle by striking him on his side. As the effort to subdue Briley continued, Briley placed another kick -- this time, harder -- into Brancato's abdomen. Brancato

4

later suffered from impairment of his pancreas and lost his gallbladder.

Briley eventually agreed to exit the vehicle, but as soon as he stepped out, the struggle resumed. Briley moved his arms to keep the officers from handcuffing him and assumed an aggressive stance. Brancato sought to control Briley by attempting to grab his shoulder, but instead hit him on the side of the head. Briley then rushed toward both Brancato and Usher and pushed them backward. Even as Brancato slung his arm over Briley's shoulder, Briley managed to drag Brancato -- until Twiname joined the fray along with Usher, and they all tumbled to the ground. After further tussling with Briley on the ground, the officers placed him in handcuffs. Briley finally ceased resisting. He subsequently denied punching or kicking anyone, and he said he did not know whether these individuals were in fact police officers.

B.

A grand jury indicted Briley in the Eastern District of Virginia. In the superseding indictment, the government alleged three violations of 18 U.S.C. § 111(a) for Briley's conduct against the officers, as well as disorderly conduct. Count 1 charged Briley with the felony of forcibly assaulting, resisting, opposing, impeding, and interfering with Officer

Brancato while making physical contact. Count 2 charged him with the felony of forcibly resisting, opposing, impeding, and interfering with Officer Usher while making physical contact (but omitted a specific allegation of assault). Count 3 charged him with the misdemeanor of forcibly resisting, opposing, impeding, and interfering with Officer Twiname (but omitted specific allegations of either assault or physical contact). Last, Count 4 charged him with the misdemeanor of disorderly conduct for recklessly creating a risk of causing public alarm, nuisance, jeopardy, and violence by engaging in an obscene display and act within federal land administered by the National Park Service, in violation of 36 C.F.R. § 2.34(a)(2).

During a two-day jury trial, Briley contested all the counts against him. The defense moved to dismiss Counts 2 and 3 on the ground that the government had failed to allege an "assault" in those instances, but the district court denied the motion. For Count 1, the district court instructed the jury that the government had to prove that Briley "forcibly assaulted, resisted, opposed, impeded, or interfered with" Officer Brancato. J.A. 424 (emphasis added). For Counts 2 and 3, the court told the jury that it was "not necessary to find assault": the government had to prove only that Briley "forcibly did any one of the several alternative acts as charged" toward Officers Usher and Twiname. J.A. 426.

The district court allowed the government, under Federal Rule of Evidence 404(b), to introduce evidence of other instances in which officers had caught Briley engaging in public sexual activities within federal parklands -- including conduct that occurred after the underlying January 2012 incident. The defense objected to the introduction of Briley's prior and subsequent acts, but was overruled. The court allowed this evidence as "well within the wheelhouse of permissible testimony under Rule 404(b)." J.A. 57.

Although the government initially asked to introduce the evidence of prior and subsequent acts as part of its case-in-chief, it ended up calling the apprehending officers to testify on rebuttal, after Briley's own testimony. To help satisfy the elements of the disorderly conduct charge, the government presented evidence of Briley's prior citations for masturbating in public restrooms (in the Marina area in 2000, and at another nearby federal park in 2001).

In addition, the court permitted the government to introduce evidence of Briley's conduct approximately two months after the underlying altercation. On March 20, 2012, Officer Enrique Wong had spotted Briley in the same Marina parking area engaging in sexual activities with another man in the same SUV. Wearing a police uniform and driving a marked police cruiser, Wong found Briley nearly naked, putting on his pants, with the

7

vehicle's front seats reclined. Wong arrested Briley and the other man without resistance or further incident. At separate bench trials, both were found guilty of disorderly conduct for this activity.

The jury convicted Briley on all four counts.[1] The district court sentenced him to a prison term of seventy-eight months, with the sentences for the various counts running concurrently. The court also imposed a term of three years of supervised release and ordered Briley to pay $62,306.10 in restitution. The lion's share of that sum, $54,849.91, was directed to Officer Brancato. After hearing expert medical testimony, the court concluded that the trauma from Briley's kicks had caused

---

[1] Before the court gave the final charge to the jury, Briley asked it to add "sexual orientation" to the instructed list of factors ("race, color, religion, national ancestry, or gender") that should not influence the jury. The government did not object, and the court stated that it would add the term to the jury instruction "out of an abundance of caution." J.A. 304. In the actual instruction, however, the court omitted the term. The defense did not object to the instruction at the time. Notably, the court had questioned prospective jurors during voir dire about their bias regarding sexual orientation, and it had issued an opening instruction to the jury not to be influenced by prejudices against either party. During closing arguments, the government referenced the court's planned instruction and told the jury that Briley was "not on trial" for his sexual orientation. J.A. 393. We find no error on this point. Briley further argues that "this failure simply underscores and magnifies the impact of the improperly admitted and prejudicial subsequent acts propensity evidence," Appellant's Reply Br. at 28 n.8 -- a point we address in Part III, infra.

Brancato's pancreatitis, which in turn had compelled the removal of his gallbladder. Briley now appeals his convictions.

## II.

Briley first contends that assault is a required element of the 18 U.S.C. § 111(a) offenses alleged in Counts 1, 2, and 3. He maintains that the government failed to charge an actual violation of § 111(a) in Counts 2 and 3, and that the district court's failure to mandate a specific finding of assault rather than other predicate acts vitiated the convictions on all three counts. We find no merit in Briley's argument. The district court read the statute properly.

## A.

Section 111 protects both the physical safety of federal officers and the integrity of their functions. See United States v. Feola, 420 U.S. 671, 678-79 (1975). Indeed, through § 111 Congress wanted to afford "uniformly vigorous protection of federal personnel" to the "maximum" degree. Id. at 684. Under the heading "Assaulting, resisting, or impeding certain officers or employees," the statute provides:

(a) In General. -- Whoever --

> (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while

engaged in or on account of the performance of official duties; or

(2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

(b) Enhanced Penalty. -- Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111. The individuals designated in §§ 111(a)(1) and (2) include "any officer or employee of the United States or of any agency in any branch of the United States Government," such as a U.S. Park Police officer. Id. § 1114.

Several features are immediately evident from the statutory structure. One is the type of officials who are protected. Subsection 111(a)(1) applies to individuals actually engaged in the performance of official duties, while § 111(a)(2) applies to those formerly engaged in such duties. The relevant acts differ for current officials in § 111(a)(1) ("forcibly assaults, resists, opposes, impedes, intimidates, or interferes") and

10

former officials in § 111(a)(2) ("forcibly assaults or intimidates"). Id. § 111(a)(1), (2).

Another important feature is the statute's graded penalty structure. The punishments increase with the severity of the crime. The final paragraph of § 111(a) provides that, "where the acts in violation of this section constitute only simple assault," a person has committed a misdemeanor, punishable by up to one year in prison. Id. § 111(a). Next, where the acts in violation of § 111 entail either "physical contact with the victim of that assault" or "the intent to commit another felony," a person has committed a felony, punishable by up to eight years in prison. Id. Moving another step up, § 111(b) specifies that, where a person performs "any" of the violative acts outlined in § 111(a) and also either "uses a deadly or dangerous weapon" or "inflicts bodily injury," that person has committed a felony, this time punishable by up to twenty years in prison. Id. § 111(b); see also United States v. Campbell, 259 F.3d 293, 299 (4th Cir. 2001).

In essence, § 111 proscribes five types of offenses: a misdemeanor (constituting only simple assault), two less serious felonies (involving either physical contact or felonious intent), and two more serious felonies (involving either a weapon or bodily injury). Notably, in defining the penalties for the various offenses, each statutory provision refers back to

11

the original list of violative acts against current or former officials. 18 U.S.C. § 111(a) ("the acts in violation of this section"); id. ("such acts"); id. § 111(b) ("any acts described in subsection (a)"). For any of the § 111 penalty provisions, then, a jury must find every element of a charged offense proved beyond a reasonable doubt, for each step on the scale increases the maximum statutory punishment. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Jones v. United States, 526 U.S. 227, 232 (1999); see also Campbell, 259 F.3d at 299 ("§ 111(b) 'provide[s] for steeply higher penalties,' which are 'condition[ed] on further facts . . . that seem quite as important as the elements' of the principal crime found in § 111(a)." (alterations in original) (quoting Jones, 526 U.S. at 233)).

A number of observations emerge from this analysis of the statutory structure. First, because Briley's actions involved current Park Police officers undertaking their official duties, all six verbs listed in the disjunctive in § 111(a)(1) are available. Second, the contours of the three § 111(a) counts come into sharper relief. Counts 1 and 2 alleged "physical contact" felonies against Officers Brancato and Usher, respectively, while Count 3 alleged a misdemeanor against Officer Twiname. By the terms of § 111(a), either a misdemeanor or a "physical contact" felony may arise from any of "the acts

12

in violation of this section" -- namely, forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with current officers such as these. And third, the district court squarely instructed the jury that the government shouldered the burden of proving beyond a reasonable doubt that Briley had "committed each and every element of the offense charged in the indictment." J.A. 420. The jury then returned a verdict finding Briley guilty on all three § 111 counts. Although the statute is written disjunctively ("or"), the jury found Briley guilty on counts that were worded conjunctively ("and").

B.

Briley now argues that assault is a required element not only of the misdemeanor in § 111(a), but also of the statute's "physical contact" felony. Although the government charged assault as part of the felony in Count 1 (against Brancato), it chose not to charge assault for either the felony in Count 2 (against Usher) or the misdemeanor in Count 3 (against Twiname). For several reasons, we do not think assault is a required element.

First, Briley's reading renders a slew of verbs in § 111(a) largely surplusage. When we interpret statutes, we must "construe all parts to have meaning." PSINet, Inc. v. Chapman, 362 F.3d 227, 232 (4th Cir. 2004). We avoid interpretations that

13

would turn some statutory terms into nothing more than surplusage. United States v. Medina, 718 F.3d 364, 367 n.1 (4th Cir. 2013); In re Total Realty Mgmt., LLC, 706 F.3d 245, 251 (4th Cir. 2013). Subsection 111(a) expressly covers a person who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a federal official. 18 U.S.C. § 111(a). Briley's reading would render five of those six words -- all but "assault" -- inoperative with respect to both the misdemeanor and the "physical contact" felony. We must, however, ascribe meaning to the five remaining verbs.

Second, and relatedly, Briley's assessment of § 111 wanders too far from congressional intent. Congress enumerated these six verbs in the disjunctive. Why would Congress, in the same subsection, then swiftly render five of these verbs extraneous or defunct? The statute, moreover, consistently references the same set of all six alternative verbs for each penalty provision -- "the acts in violation of this section" for the misdemeanor in § 111(a), "such acts" for the lesser felonies in § 111(a), and "any acts described in subsection (a)" for the greater felonies in § 111(b). Those phrases obviously denote all six verbs. Why would Congress repeatedly refer back to the same list of threshold acts for every designated offense, and yet covertly assign varying acts to different crimes? The obvious answer is that Congress had no such intention: a person could commit any

14

one of these six acts and still fall under the statute's coverage.

Third, Briley's interpretation rips a big hole in the statutory scheme. Although his reading largely preserves the protections for the physical safety of federal officials, it leaves those officials without protection for the carrying out of federal functions. It misses the crucial point that § 111 safeguards not only physical safety, but also functional integrity. See Feola, 420 U.S. at 678-79. More broadly, it undercuts the statute's mandate of full and vigorous enforcement. See id. at 684.

Fourth, Briley's take on § 111 produces an absurd result. His reading would allow an individual to commit an array of forcible acts against federal officials performing government functions without criminal consequence. That person could use force to resist federal officials, to oppose them, to impede them, to intimidate them, and to interfere with them -- and yet escape the reach of § 111. Apparently, such a person could evade sanction so long as he or she did not also (1) act with the intent to commit another felony, (2) use a deadly or dangerous weapon, or (3) inflict bodily injury. See Appellant's Br. at 14. That too leaves a patchwork statute, not the comprehensive protections Congress intended.

15

Finally, although some of our sister circuits have read § 111 somewhat differently, the operative distinctions between those approaches and the conclusion we draw today are limited. Some circuits have agreed with us that § 111 prohibits the six different kinds of enumerated acts and that, specifically, the misdemeanor provision is not limited to assault. United States v. Williams, 602 F.3d 313, 317-18 (5th Cir. 2010); cf. United States v. Gagnon, 553 F.3d 1021, 1027 (6th Cir. 2009) (adding that "Congress . . . used the phrase 'simple assault' as a term of art to incorporate the actions proscribed in § 111(a)(1) and § 111(a)(2)"). The Second Circuit has taken an ostensibly varying view of § 111 and concluded that some form of "simple assault" is required for the misdemeanor provision. United States v. Davis, 690 F.3d 127, 135 (2d Cir. 2012) ("[F]or a defendant to be guilty of the misdemeanor of resisting arrest under Section 111(a), he necessarily must have committed common law simple assault."). Whatever variance the latter decision manifests arises seemingly from facts that involved primarily passive resistance toward all the officers involved, compared with Briley's active, forcible actions against the Park Police. See Davis, 690 F.3d at 129-30 ("Davis did not fight back. . . . There was no evidence that Davis threatened or struck out at any of the agents."). Given the statute's crucial adverb -- "forcibly" -- the factual distinctions are significant. Facts of

16

the more passive kind fall much closer to the nonforcible borderline. Whatever daylight lies between the circuits' approaches, it seems to us that the practical distinction is not a large one.

For those reasons, it was proper for the district court to instruct the jury that Briley could have committed any of the threshold acts charged -- not "assault" only -- to be found guilty of a § 111 offense, so long as the other elements of the offense were satisfied.

III.

Briley also argues that the district court erred in admitting evidence of a subsequent crime under Federal Rule of Evidence 404(b). Over the defense's objection, the district court allowed the government to introduce evidence of Briley's conduct at the same Washington Sailing Marina parking area in March 2012, about two months after the underlying incident. A Park Police officer had observed Briley and another man engaging in sexual activities in the same SUV. He arrested both men and faced no resistance. At trial, the government sought to introduce evidence of the March arrest to show Briley's reckless

17

intent for the disorderly conduct alleged in Count 4.[2] We do not think this evidence should have been admitted. But given the overwhelming evidence from the underlying January incident, we find no reversible error.

A.

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. 404(b)(2).

Rule 404(b) is a rule of inclusion. United States v. Lespier, 725 F.3d 437, 448 (4th Cir. 2013); see United States v.

---

[2] The National Park Service regulation invoked in Count 4 provides:

> A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person . . . [u]ses language, an utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace."

36 C.F.R. § 2.34(a)(2).

18

Van Metre, 150 F.3d 339, 349 (4th Cir. 1998) (noting that the Rule's list of allowable purposes is "illustrative, rather than exclusive"). As we have long maintained, the Rule's inclusive nature militates toward "'admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition.'" Lespier, 725 F.3d at 448 (quoting United States v. Rooks, 596 F.3d 204, 211 (4th Cir. 2010)); see, e.g., United States v. Masters, 622 F.2d 83, 85 (4th Cir. 1980). Rule 404(b) permits the admission of evidence of not only prior but also subsequent acts. United States v. Mohr, 318 F.3d 613, 617 (4th Cir. 2003).

We do not overturn Rule 404(b) rulings lightly. District judges enjoy broad discretion to determine what evidence should be admitted under the Rule, which resides at the core of the trial judge's function of handling evidentiary challenges. Under this standard, a district court abuses its discretion "'when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law.'" Rooks, 596 F.3d at 210 (quoting United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007)).

We review evidentiary determinations for harmless error. United States v. Madden, 38 F.3d 747, 753 (4th Cir. 1994). A nonconstitutional error ceases to be harmless if it had a

19

"substantial and injurious effect or influence in determining the jury's verdict." Kotteakos v. United States, 328 U.S. 750, 776 (1946). The core of the inquiry is whether the error affected the defendant's substantial rights. See Fed. R. Crim. P. 52(a). We do not reverse evidentiary rulings for inconsequential technicalities. Rather, "reversal is reserved for more serious errors that affect substantial rights or that directly affect the outcome of a case." United States v. Ferguson, 752 F.3d 613, 619 (4th Cir. 2014).

B.

While Rule 404(b) is an inclusive rule, it is not all-inclusive. The "other bad act" admitted in this instance came too close to pure propensity evidence.

The relevance of the March 2012 evidence to proving Briley's intent or state of mind in January stands in some question. It is true that we make "no distinction" between prior and subsequent bad acts under Rule 404(b), United States v. Lighty, 616 F.3d 321, 352 n.33 (4th Cir. 2010), with the timing of the act often being a matter of evidentiary weight for the jury, see Huddleston v. United States, 485 U.S. 681, 689 (1988); United States v. Hadaway, 681 F.2d 214, 217-18 (4th Cir. 1982). And the January and March episodes do share some similar features. Both times, the Park Police found Briley engaging in

20

sexual conduct, in the same vehicle, in the same general area. At another level, however, the character of the acts was quite different. The March incident was largely uneventful. When confronted by Officer Wong, Briley did not resist arrest. The January incident, on the other hand, involved a violent confrontation that went to the heart of the obstructive activity charged under 18 U.S.C. § 111.

The evidence from January formed a compelling and consistent case against Briley on all four counts. The jury heard about the encounter and the ensuing altercation with Park Police in painstaking and vivid detail. The January evidence described Briley's meeting with his companion and their preparations to engage in sexual relations. It showed the extended struggle between Briley and the crew of officers trying to detain him. It conveyed his determined resistance to the officers both inside and outside the vehicle. It revealed the damaging injuries he inflicted on the officers. As officer after officer took the witness stand, and as Briley's companion recounted the events inside the vehicle, the jury learned about the January incident from every angle.

The government introduced the March arrest in support of the disorderly conduct charge in Count 4. But even with a recognition of the uncertainties of trial outcomes, the prosecution had to know it had more than enough evidence from

21

the January incident alone to prove that Briley had engaged in an unlawful act at the Marina, in violation of the disorderly conduct regulation. The district court told the jury that Briley could be deemed to have acted recklessly, as required by 36 C.F.R. § 2.34(a)(2), if he knew that the obscene act was "inappropriate" and that it would "cause public alarm, [nuisance], jeopardy, or violence if it was seen." J.A. 430. From the January incident, there was more than ample evidence for a rational jury to conclude that Briley's conduct cleared that modest bar. With so few lingering questions about Briley's criminal conduct in January, and the evident ability of intimate sexual activities in public places to constitute disorderly conduct on their own terms, the need to introduce the March incident seems dubious at best. See United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997) (listing necessity as a factor in Rule 404(b) analysis).

Also relevant in the Rule 404(b) analysis is the comparison of the probative value and prejudicial nature of the evidence. See Fed. R. Evid. 403; Queen, 132 F.3d at 997 (holding that, as part of the Rule 404(b) inquiry, "the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process"). In Briley's case, there was some slight probative value to the evidence. The March

22

arrest did bear some connection to the purposes for which it was offered, in the sense that it underscored Briley's recklessness, as required by the disorderly conduct regulation.

On the other hand, there was a risk in using the March incident at trial. That risk inheres in all propensity evidence, namely that the government could deploy the subsequent act as a character smear that might actually infect the entirety of the trial -- by portraying the defendant in the eyes of the jury as a person deserving of particular condemnation almost irrespective of the various forms of misconduct of which he stood accused. But of course Rule 404(b) expressly forbids evidence to be used in that way. The March evidence carried a risk of shifting the trial's focus away from the confrontation whose violent and injurious nature had given rise to the prosecution, and toward the portrayal of a character of general disrepute. Given that there was more than enough evidence from the January incident to support all the charges in the indictment, including the disorderly conduct charge, the need to push the defendant's personal habits and inclinations forward raises Rule 403 concerns.

The trouble with such character wounds is that they bleed, in the sense that "bad people" may be presumed by the factfinder to commit no end of criminal acts. The government unquestionably had every right to charge Count 4. But to use this least serious

23

charge as a conduit for bringing in unseemly acts not charged in the indictment -- which then might affect consideration of the more serious charges -- is a different matter. Shining such a bright light on Briley's other sexual activities risked directing the jury's attention to the wrong place.

Nevertheless, the evidence from the beginning to the end of the January incident is compelling and incriminating as to all the charged counts. When viewed in the context of the barrage of evidence from the January incident -- for the disorderly conduct charge as well as the three § 111 charges -- the error in admitting the March evidence was plainly harmless.

An array of witnesses gave clear, compelling, and consistent accounts about Briley's actions. Officers Brancato, Usher, Mace, and Twiname each testified about the events of that January afternoon. Brancato and Usher discussed their surveillance of Briley and the other man, and they described Briley's sexual conduct that was visible from outside, through the SUV's window. The four officers recounted the details of the altercation that followed -- the initial approach, the swift compliance by Briley's companion, Briley's refusal to exit, his fierce resistance against being removed from the vehicle, his injurious strikes against the officers, the continued skirmishing after he exited the vehicle, and his eventual arrest. Briley's companion (who had signed an informal immunity

24

agreement) also testified about his interactions with Briley and the officers. He related his personal history with Briley, their meeting in the Marina parking area, their preparations for sexual relations, their efforts to avoid detection, and the confrontation with the Park Police.

It is plain that the jury credited the version of the facts put forward by the Park Police and by Briley's own companion and disbelieved Briley's version of the incident, namely that he did not punch or kick anyone and was unaware the individuals were police officers. A plethora of testimony established that Briley had engaged in intimate sexual activities in a public place, and that he had forcibly resisted and struck the officers trying to arrest him. The district court, for its part, properly instructed the jury under § 111 and the disorderly conduct regulation and offered a range of other cautionary directives.

We can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," that the jury's consideration was not "substantially swayed" by Officer Wong's testimony about the March incident. Kotteakos, 328 U.S. at 765. The absence of necessity for admitting "other bad acts" evidence will not invariably link up with a finding of harmless error, but here we are confident that the error affected neither Briley's substantial rights nor the outcome of the case. See Ferguson, 752 F.3d at 619. Despite the evident

25

dangers of admitting the evidence, we are not left in "grave doubt" about its impact. Kotteakos, 328 U.S. at 765. Our charge is to detect wrongs that trenched upon a defendant's substantial rights, and the error did not do so here.

## IV.

For the foregoing reasons, the judgment is affirmed.

AFFIRMED