**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4370

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MARION KATRELL CAMPBELL,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Bruce H. Hendricks, District Judge. (2:17-cr-01180-BHH-1)

Argued: May 4, 2021                                   Decided: June 7, 2021

Before WILKINSON, WYNN, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Harris joined. Judge Wynn wrote an opinion concurring in the judgment.

**ARGUED:** Charles William Cochran, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, South Carolina, for Appellant. Janet Carra Henderson, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** Sherri A. Lydon, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Defendant-appellant Marion Campbell was charged with possession of methamphetamine with intent to distribute, possession of a firearm in furtherance of drug trafficking, and possession of a firearm as a convicted felon. After a jury trial, he was convicted on all three counts. On appeal, Campbell brings two claims. First, he argues that the recorded jail calls that were admitted at trial violated Federal Rule of Evidence 404(b). Second, he argues that DEA Agent Todd Briggs did not sufficiently establish his methodology for his expert testimony under Rule 702. For the reasons that follow, we affirm the judgment of the district court.

I.

On July 8, 2017, Campbell was pulled over by two Walterboro police for driving with an inoperative headlight. When dispatch informed the officers that the defendant had a suspended license, they arrested him and had a K9 sniff his vehicle. After the dog alerted the officers to the presence of narcotics, they searched the vehicle and found a loaded handgun, ammunition, a bag of methamphetamine, a small bag of crack cocaine, small amounts of marijuana, and empty small plastic baggies.

Campbell was indicted on three counts: (1) possession of meth with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); (2) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (3) possession of a firearm as a felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), (e). While in custody pending trial, he made hundreds of phone calls that were recorded. The district court admitted two calls (Call #8 and Call #11) at trial over the defendant's

objections. The court found that Call #8 was "admissible to show consciousness of guilt and knowledge by the defendant on how to make meth." J.A. 366. And Call #11 was admissible "to prove intent" to distribute drugs. J.A. 370.

In Call #8, Campbell told his ex-girlfriend, Lee Guess, that he had been "getting it for . . . three hundred a half." J.A. 191. Guess referred to the product as "clear" and said she could get it for four hundred, which Campbell said was "a good price." J.A. 191. Campbell told her not to get diluted ammonia when she goes to Ace Hardware. J.A. 192. Guess responded by reminding Campbell not to "say[] this over this phone." J.A. 192. Campbell said that the "pure ammonia" was for their "cleaning business." J.A. 192–93.

Call #11 was also between Campbell and Guess. He requested that she ask another person about the quality of "clear" that he had been selling. J.A. 199. He told her that his product had "[n]o shake" and "didn't crumble" when broken up. J.A. 199.

These two calls were explained at trial by the government's expert witness, retired DEA Special Agent Todd Briggs. Briggs retired from the DEA after twenty years of service. Before that, he was a Marine Corps infantry officer whose last assignment was conducting counter drug operations at the U.S.-Mexico border. During his DEA service, Briggs spent ten years in Iowa "work[ing] almost exclusively methamphetamine cases." J.A. 475. He then relocated to Columbia, South Carolina, where he worked cocaine, marijuana, methamphetamine, and opioid cases. He had formal training at the DEA Academy on "everything from drug identification, how drug operations work, . . . the history of the illegal drug trade in [the] United States" and later at a series of specialized schools to learn how to handle specific situations such as clandestine laboratories. J.A.

3

476. He also learned on the job by reviewing telecommunications, such as phones and pagers. He interviewed over one hundred drug traffickers and listened to hundreds of hours of surveillance—in 2007 alone, Briggs conducted "nine months of surveillance in one town." J.A. 477. During his career, he listened to real-time telephone calls through court-approved wiretaps of traffickers' phones in eight- or ten-hour shifts.

After Briggs explained his credentials and his work experience, the defendant objected to Briggs testifying about the intent of the defendant. The government explained that Briggs was not there to testify as to intent but rather as to the meaning of Campbell's coded drug language and how the meth trade operates. The court cautioned Briggs not to say anything suggesting he knew of the defendant's actual intent, and then admitted him as an expert witness. J.A. 481–82. Briggs proceeded to explain the nature, manufacture, and distribution of meth, the slang terms and code words for meth, and both the drug market generally and the South Carolina meth market specifically. *See* J.A. 483–99. He also explained the language used on the recorded calls. *See* J.A. 488–92.

The jury returned a guilty verdict on all three counts of the indictment. The defendant was sentenced to 360 months' imprisonment. This appeal timely followed.

II.

Campbell first argues that the recorded jail calls were overly prejudicial evidence that should not have been admitted pursuant to Federal Rule of Evidence 404(b). We review the trial court's ruling as to the admissibility of evidence for abuse of discretion. *United States v. Day*, 700 F.3d 713, 728 (4th Cir. 2012). Upon examining the record, we find none.

4

Rule 404(b) divides "other crimes, wrongs, or acts" into two categories. It prohibits admission of evidence of such "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, it allows such evidence to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). This rule "is an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Lespier*, 725 F.3d 437, 448 (4th Cir. 2013) (quoting *United States v. Rooks*, 596 F.3d 204, 211 (4th Cir. 2010)).

We have developed a four-part test to assess the admissibility of evidence under Rule 404(b):

(1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant.
(2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense.
(3) The evidence must be reliable. And
(4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

*United States v. Bell*, 901 F.3d 455, 465 (4th Cir. 2018) (quoting *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997)). Failing the fourth prong requires more than the evidence be damaging to the defendant's case because "highly probative [evidence] invariably will be prejudicial to the defense." *Id.* (quoting *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009)) (alteration in original).

5

The two phone calls admitted at trial meet the requirements of this test. First, Campbell's discussion of the market price for meth, an ingredient for meth, and meth quality speaks to his knowledge and intent, which are two legitimate reasons for admitting this kind of evidence. *See* Fed. R. Evid. 404(b)(2). They show that the defendant charged with trafficking meth was knowledgeable about the business of manufacturing and distributing meth. Since he was the only person in the stopped vehicle, this was highly probative of his state of mind. Since Campbell's intent was at issue as an element of the offense, this evidence also satisfied the second part of the test. Third, the evidence was reliable because the words were the defendant's own. Finally, there was nothing particularly emotional about this evidence that might subordinate the faculties of reason, so there was no unfair prejudice. Any risk of such prejudice was mitigated by the district court's limiting instruction. *See Lespier*, 725 F.3d at 448 (citing *United States v. White*, 405 F.3d 208, 213 (4th Cir. 2005)); J.A. 607–08.

Ultimately, this issue presents a question of the weight of the evidence, not a question of admissibility. Defense counsel was free to explore that weight on cross-examination. And the jury was free to assign whatever weight it found appropriate to the evidence in reaching its verdict. As such, the district court did not abuse its discretion in admitting the phone calls.

III.

Campbell's second assignment of error is that the district court improperly admitted Agent Briggs as an expert witness. He argues that the government failed to establish

6

Briggs's methodology in deciphering the drug lingo on the calls. We review this ruling for abuse of discretion. *United States v. Chikvashvili*, 859 F.3d 285, 292 (4th Cir. 2017).

If an error is harmless, we will not vacate the conviction. *United States v. Sutherland*, 921 F.3d 421, 429 (4th Cir. 2019); *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). An error is harmless when the court is able to conclude, after reviewing the record as a whole, "that the judgment was not substantially swayed by the error." *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). When it comes to evidentiary rulings, we do not reverse "for inconsequential technicalities. Rather, 'reversal is reserved for more serious errors that affect substantial rights or that directly affect the outcome of a case.'" *United States v. Briley*, 770 F.3d 267, 276 (4th Cir. 2014) (quoting *United States v. Ferguson*, 752 F.3d 613, 619 (4th Cir. 2014)). "Where, as here, the error was preserved," the government bears the burden of proving harmlessness. *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005).

## A.

Assuming *arguendo* that the failure to explain that the methodology here was error, we think that the government has demonstrated that the error was harmless. First and foremost, there was ample other evidence introduced at trial for a reasonable jury to convict the defendant. To convict a person of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a)(1), "the government must prove: (1) possession of a narcotic controlled substance; (2) knowledge of the possession; and (3) the intent to

7

distribute." *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005) (citing *United States v. Randall*, 171 F.3d 195, 209 (4th Cir. 1999)).

Possession can be established by either actual or constructive possession. *United States v. Herder*, 594 F.3d 352, 358 (4th Cir. 2010). "A person may have constructive possession of contraband if he has ownership, dominion, or control over the contraband or the . . . vehicle in which the contraband was concealed." *Id.* (citing *United States v. Armstrong*, 187 F.3d 392, 395 (4th Cir. 1999)). Like the defendant in *Herder*, Campbell was the only person in the car with the meth and the drugs were within his reach; thus he had such dominion and control to establish possession. *See id.* at 358–59. Not only was the meth within Campbell's reach, it was in his door—a location of easy access and visibility. A reasonable jury could infer knowledge from this information. *See, e.g.*, *United States v. Mendoza¸* 522 F.3d 482, 489 (5th Cir. 2008). Finally, the baggies found in the car support an intent to distribute. *See, e.g.*, *United States v. Dennison*, 925 F.3d 185, 189 (4th Cir. 2019) (discussing drug paraphernalia that can support a finding of intent to distribute). In sum, there was sufficient evidence from Campbell's vehicle to support his § 841 conviction.

The same logic applies to defendant's gun convictions. The gun was found underneath the driver's seat with .38 rounds on the driver's floorboard. For the reasons articulated above, that fact can support the jury's finding of possession on both gun charges. And possessing a gun in close proximity to narcotics is sufficient for a § 924(c) possession in furtherance of drug trafficking conviction. *See, e.g.*, *United States v. Lomax*,

293 F.3d 701, 704–06 (4th Cir. 2002). Thus, a reasonable jury could have convicted Campbell on the gun charges based on the evidence from his vehicle as well.

B.

With regard to the expert testimony itself, it is conceded that Briggs had the necessary relevant experience to draw the conclusions he presented. Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

However, not all experts are the same, and courts can treat, say, a product engineer in a tort case differently from a scientist or a drug expert. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (explaining that district courts have "broad latitude" in "how to determine reliability" such that engineers can be evaluated differently from scientists, *id.* at 142 (emphasis omitted)).

In narcotics cases, we have long held that expert testimony on the meaning of coded language and drug trafficking patterns by government agents with field experience is admissible. In fact, in *United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007), we rejected an argument very similar to the defendant's here. *See id.* at 273–74 ("The thrust of Appellants' argument is that [Agent] Seabolt failed to explain adequately how his experience in the narcotics field supported the methodology used and the ultimate conclusions made concerning the coded language spoken in the recorded conversations.").

We explained that "[e]xperiential expert testimony" was different from scientific expert testimony and was allowable from "law enforcement officers with extensive drug experience." *Id.* at 274–75. The advisory committee notes specifically considered this kind of testimony. *See id.* ("[T]he principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations." (quoting Fed. R. Evid. 702 advisory committee's note)). In numerous cases, we have allowed this testimony from law enforcement. *See, e.g.*, *United States v. Smith*, 919 F.3d 825, 835–36 (4th Cir. 2019) (allowing FBI agent with "substantial experience in drug and gang investigations" to decipher drug conversations, *id.* at 835); *United States v. Garcia*, 752 F.3d 382, 389–91 (4th Cir. 2014) (finding that FBI agent was properly admitted as an expert to decode drug slang in conversations); *United States v. Hopkins*, 310 F.3d 145, 150–51 (4th Cir. 2002) (allowing "expert testimony by [Montgomery County] police officer Lawrence Phillips regarding narcotics trafficking," *id.* at 150).

Agent Briggs is no different than the countless other government agents qualified to give expert opinions on the meaning of coded drug lingo and the functioning of drug trafficking operations. And he documented his qualifications for the court and jury—year upon year of experience investigating drug operations. From that experience, we can deduce his methodology. He had heard the language used, seen the trafficking transpire, interviewed drug operatives, and pieced together the meaning of the street slang. *See*

10

*Wilson*, 484 F.3d at 275 (approving an agent who employed such a method). He then applied that knowledge to Campbell's recorded conversations. *See* J.A. 494–96.

As to the drug pricing, Briggs had worked drug distribution cases in South Carolina long enough to know typical going rates for bulk purchases of meth—much like commuters might be attuned to fluctuations in gas prices along their regular route. He explained how drug prices vary like many other products based on quantity purchased. *See* J.A. 486–87. And he also explained that the prices discussed in the call were consistent with the prices at which he saw meth being sold in South Carolina at the time Campbell was arrested. *See* J.A. 489, 498–99.

Agent Briggs further testified as to the use of ammonia in the meth manufacturing process. *See* J.A. 490–91. Although he did not talk about his methodology here, he earlier said that he had attended DEA classes on "how drug operations work" and on "clandestine laborator[ies]." J.A. 476. His experience as a practicing DEA agent surveilling meth traffickers and manufacturers would have provided him with a basis for knowing how manufacturers procure the ingredients and why different people procure each ingredient. *See* J.A. 491. His testimony derived from his prior study of meth manufacturing as a part of his DEA training and his observation of manufacturing while working as an agent.

Furthermore, Agent Briggs was open to cross-examination. Campbell's attorney asked him about his involvement in this particular case, to which Briggs responded that he had none, other than listening to the recorded jail calls. J.A. 499–500, 503–04. When questioned about the ammonia discussed in one of the jail calls, he explained the difference between the pure ammonia needed for the production of meth and the diluted ammonia

11

available at hardware stores. *See* J.A. 504–06. Finally, he explained that "shake" could refer to marijuana in addition to meth. J.A. 507. At no point was this cross-examination curtailed and the defendant does not contend that it was.

It is true that Agent Briggs did not point to a specific experience to inform each opinion, but we have never required this for experiential expert opinions. *See Smith*, 919 F.3d at 836. This is because the application of "years of investigatory experience and exposure to thousands of gang and drug conversations . . . to analyze the meaning of certain terms does not lend itself to a direct correlation between one experience and opinion." *Id.* Given the relevance of the expert's experience, the cross-examination of the expert, and the substantial evidence independent of the expert testimony, we find that any error pertaining to an insufficient explanation of methodology was harmless.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

WYNN, Circuit Judge, concurring in the judgment:

I concur in the outcome reached by majority opinion. I write separately to emphasize that while the district court's admission of Special Agent Briggs's testimony on drug slang was harmless error, it was nonetheless error.

In *United States v. Wilson*, our chief case on the admissibility of law enforcement testimony to contextualize and explain drug lingo,[1] we considered whether a district court erred by admitting the expert testimony of a law enforcement officer who, at times, "offered his interpretation of the meaning of a conversation without offering any reliable explanation as to why he opined that the conversation meant what it did." 484 F.3d 267, 276 (4th Cir. 2007). We concluded that while the officer "applied his methods and principles reliably in the vast majority of his testimony," the district court "erred in failing to exclude [his] testimony when . . . [he] did not adequately explain his methodology in reaching a questionable interpretation." *Id.* at 277–78.

---

[1] The Federal Rules of Evidence assumes that players in drug transactions use coded language "to conceal the nature of their activities." Fed. R. Evid. 702 advisory committee's notes to 2000 amendments. Our precedent largely adopts this assumption. *See, e.g.*, *Wilson*, 484 F.3d at 276 (asserting that "the primary purpose of coded language is to conceal the meaning of the conversation from outsiders through deliberate obscurity" (quoting *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999))). But as with many of the assumptions that underpin our practice of permitting law enforcement agents to testify as expert witnesses on the communications of drug dealers, this assumption may lack a solid empirical foundation. My own suspicion is that much drug slang and lingo and even "code" may simply be the product of a culture where miscommunication and misinterpretation can trigger far greater consequences than arrest, and where particularly precise communication is therefore necessary. I believe district courts should be similarly precise in identifying why drug dealers depart from "the King's English" before they determine whether a proposed expert witness may properly testify regarding the communications at issue.

Here, Special Agent Briggs offered virtually no explanation of his methodology or of how he applied his method reliably to the facts of this case to determine the meaning of non-self-evident terms or phrases like "clear," "shake," "crumble," and "ears were ringing." J.A. 489, 492. The district court therefore erred in failing to exclude this testimony. *See Wilson*, 484 F.3d at 278; *United States v. Johnson*, 617 F.3d 286, 294–95 (4th Cir. 2010) (expressing doubt that an officer's testimony would have been admissible to explain drug lingo under Rule 702 when the officer "repeatedly indicated that he had the expertise to testify regarding drug jargon and the drug trade generally, [but] provided virtually no methodology or guiding principles that would enable him to decode the wiretapped phone calls [at issue]").

But for the reasons ably described by my good colleague, this error was harmless. I therefore vote to affirm.